UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

|  |  |  |
|---|---|---|
| **PETERUS BEUKES,** | ) | |
| **STEPHANUS DE KLERK, and** | ) | |
| **CORNELIUS ENGELBRECHT,** | ) | |
| **on behalf of themselves** | ) | |
| **and others similarly situated** | ) | |
|  | ) | |
| **Plaintiffs,** | ) | |
|  | ) | |
| **vs.** | ) | Civil Case No. _____ |
|  | ) | |
| **BOEHNKE WASTE HANDLING,** | ) | |
| **LLC and CHAD J. BOEHNKE,** | ) | |
|  | ) | |
| **Defendants.** | ) | |

---

## COLLECTIVE ACTION COMPLAINT

1.      Plaintiffs Peterus Beukes ("Beukes"), Stephanus De Klerk ("De Klerk"), Cornelius Englebrecht ("Englebrecht"), and on behalf of themselves and all others similarly situated, bring this action against Boehnke Waste Handling, LLC ("BWH") and Chad J. Boehnke ("Boehnke") (collectively "Defendants") seeking unpaid minimum and overtime wages, damages, and penalties pursuant to the Fair Labor Standards Act (hereafter "FLSA"), 29 U.S.C. §§201 et seq.

2.      Plaintiffs Buekes, De Klerk, and Engelbrecht also bring individual claims against Defendants pursuant to the Minnesota Whistleblower Act, Minn. Stat. §§ 181.931 – 181.935 (hereafter "MWA"); the Minnesota Fair Labor Standards Act (hereafter "MFLSA"), Minn. Stat. § 177.21 *et seq*; and under Minnesota common law for breach of contract of the federal H-2A regulations at 20 C.F.R. § 655.122 *et seq*.; unjust enrichment, and quantum meruit.

3.      On behalf of themselves and all similarly situated, Plaintiffs seek to recover unpaid minimum and overtime wages owed to them pursuant to 29 U.S.C. § 216(b). Defendants

failed to pay Plaintiffs and the putative FLSA collective action members (hereafter "putative collective action members") wages they were owed for time spent traveling to and from worksites where they were employed. Defendants also failed to pay Plaintiffs and the putative collective action members overtime wages for hours worked in excess of 40 hours for those workweeks during which they performed nonagricultural work.

4.      Plaintiffs and the putative collective action members worked for Defendants at various points during the three-year period preceding the filing of this complaint. Over the past three years, Defendants operated a labor contracting business handling waste and manure for dozens of different dairies, ranches, and farms across Minnesota, Iowa, South Dakota, and North Dakota. Plaintiffs and the putative collective action members pumped, processed, hauled and spread manure at dozens of different worksites. Plaintiffs and putative collective action members' manure handling work involved exposure to hazardous waste and noxious fumes produced in large manure pits.

5.      During their employment by Defendants, Plaintiffs and the putative collective action members were not compensated for their time spent traveling to and from remote worksites as part of their job duties.

6.      Defendants also housed Plaintiffs in substandard and unpermitted facilities, including in rooms in Defendants' machine workshop which lacked windows for ventilation and where Plaintiffs were exposed to manure and machine fumes.

7.       When Plaintiffs De Klerk and Engelbrecht spoke up about these violations and made good faith complaints regarding unsafe working and housing conditions, improper pay and other violations of federal and state law, Defendants retaliated against these Plaintiffs by prematurely terminating their employment before the end of their work contracts and then

interfering with Plaintiff Engelbrecht's efforts to obtain other employment in 2023.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 29 U.S.C. § 216(b) (Fair Labor Standards Act ("FLSA")) and 28 U.S.C. § 1331 (Federal Question).

9.      This Court has supplemental jurisdiction over Plaintiffs' state law causes of action pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Defendants are residents of this district and many of the events giving rise to Plaintiffs' claims occurred within this judicial district.

## PARTIES

11.      Plaintiffs Cornelius Engelbrecht, Stephanus De Klerk, and Peterus Beukes are citizens of the Republic of South Africa. At all times relevant to this action, Plaintiffs were admitted to the United States on a temporary basis pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) to work as agricultural equipment operators for Defendants. Throughout the period of their employment by Defendants, Plaintiffs were engaged in commerce within the meaning of the FLSA and its implementing regulations, because they regularly handled tools, vehicles, and equipment moved and produced in commerce. Plaintiffs also transported equipment, tools, and other workers across state lines in the course of their employment for Defendants. Plaintiffs' consent forms are attached as Exhibit A, Exhibit B, and Exhibit C to this Complaint.

12.      Plaintiffs' FLSA minimum wage and overtime claims are asserted as collective actions pursuant to 29 U.S.C. §216(b).

13.      Defendant Boehnke Waste Handling, LLC is a Minnesota Limited Liability Company based in Lac qui Parle County. At all times relevant to this action, Defendant was an

"employer" of Plaintiffs and the putative collective action members within the meaning of the FLSA, 29 U.S.C. § 203(d), the MFLSA, Minn. Stat. § 177.23(6), and the H-2A regulations, 20 C.F.R. § 655.103(b). Defendant Boehnke Waste Handling directed and supervised the work activities of Plaintiffs and the putative collective action members, assigned them their tasks, and paid them their wages for their labor. Defendant Boehnke Waste Handling had annual gross volume of sales or business done of at least $500,000.00 per year in accordance with 29 U.S.C. §203(s)(1)(A)(ii) and engaged in commerce by, among other things, offering and providing its services in multiple states across the country.

14.     Defendant Chad Jeremy Boehnke is the owner and principal of Boehnke Waste Handling, LLC. At all relevant times to this action, Defendant Boehnke directed and supervised the work activities of Plaintiffs and the putative collective action members, assigned them tasks, and paid them wages for their labor. At all times relevant to this action, Chad Jeremy Boehnke exercised daily operational control over Defendant Boehnke Waste Handling, LLC.

15.     At all times relevant to this action, Plaintiffs and the putative collective action members were employed by Defendant employers and were "employees" within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

16.     At all times relevant to this action, Plaintiffs and the putative collective action members performed services for hire for Defendant employers and were "employees" within the meaning of the MWA, Minn. Stat. § 181.931(2).

17.     At all times relevant to this action, Plaintiffs and the putative collective action members were individuals employed by Defendant employers and were "employees" within the meaning of the MFLSA, Minn. Stat. § 177.23(7).

18.    At all times relevant to this action, Defendants' principal place of business and base for its manure handling operations was in Lac qui Parle County, Minnesota.

## FACTS

19.    Plaintiffs Engelbrecht and Beukes worked for Defendants in 2021 and 2022 alongside other similarly situated workers.

20.    Plaintiff De Klerk Worked for Defendants in 2022 and 2023 alongside other similarly situated workers.

## FLSA Collective Action Class Definition

21.    Plaintiffs bring a collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves and all similarly situated individuals in the collective action. The collective action class is defined as all H-2A workers employed pursuant to H-2A applications filed by or on behalf of Boehnke Waste Handling, LLC to perform labor in 2021, 2022, or 2023.

## Collective Action Allegations

22.    Collective action treatment of claims of Plaintiffs and the putative collective action members FLSA claims is appropriate because the named Plaintiffs and the other members of the collective action have been subjected to the common business practices of Defendants, and the success of their claims depends upon the resolution of common issues of law and fact, including, *inter alia:*

      a.    Whether Defendants compensated the named Plaintiffs and the other members of the collective action for the time they spent traveling during work hours between different work locations;

      b.    Whether Defendants paid Plaintiffs and the other collective action members the FLSA minimum wage for the time they spent traveling from Defendants'

main worksite in Marietta, Minnesota to other worksites and from other

worksites to Defendants' main worksite in Marietta, Minnesota;

c.  How much time the named Plaintiffs and the collective action members spent

on the above work-related activities.

d.  Whether Defendants were entitled to exemption from the FLSA's overtime

requirements, 29 U.S.C. § 207, with respect to the work performed by

Plaintiffs and the putative collective action members;

e.  Whether the Defendants paid Plaintiffs and the putative collective action

members the FLSA overtime rate required by 29 U.S.C. § 207 for all hours

these individuals worked in excess of 40 in a given workweek; and

f.  How many overtime hours were worked by the named Plaintiffs and the

collective action members.

23.    The named Plaintiffs and the collective action members have been similarly

affected by Defendants' failure to compensate its H-2A employees for travel time and were not

paid minimum wages under 29 U.S.C. § 206, which amounts to a single decision, policy or plan

to avoid paying all minimum wages earned by the Plaintiffs and the collective action members.

24.    Throughout the time they were employed by Defendants during the relevant time

period, Plaintiffs and the other members of the collective action were not paid overtime wages

under 29 U.S.C. § 207, which amounts to a single decision, policy or plan to avoid paying all

overtime wages earned by the Plaintiffs and the collective action members.

25.    The named Plaintiffs are similarly situated to the collective action members and

will prosecute this action vigorously on their behalf.

26.     A collective action is an appropriate method for appropriate and efficient adjudication of these claims.

## Facts Common to All Collective Action Members

27.     Defendants required Plaintiffs and the collective action members to travel long hours between jobsites while on duty. Defendants consistently failed to compensate Plaintiffs and the putative collective action members for this travel time between jobsites while on duty.

28.     Among other things, when their job duties included non-agricultural waste handling at other farms, Defendants required Plaintiffs and the putative collective action members to pick up equipment and trucks at the Defendants' headquarters located in Marietta, Minnesota and to drive these trucks and equipment to the other jobsites during the normal workday.

29.     At all times relevant to this Complaint, Defendants regularly and consistently failed to compensate Plaintiffs and the putative collective action members for the time they spent driving trucks and other equipment from Defendants' headquarters in Marietta, Minnesota to the other job sites as well as hauling equipment from various worksites back to Defendants' headquarters in Marietta, Minnesota.

30.     In addition, during all times relevant to this complaint, Defendants required Plaintiffs and the putative collective action members to travel long hours to and from worksites in Iowa, South Dakota, North Dakota, and other locations in Minnesota, which often have required Plaintiffs and the putative collective action members to stay overnight in these locations away from their principal place of residence. Despite employing Plaintiffs and the putative collective action members to travel between these worksites, Defendants have not compensated Plaintiffs and the putative collective action members for this work time.

31. In each workweek during which they were employed by Defendants Plaintiffs and the putative collective action members performed work that was not agricultural within the meaning of the FLSA, 29 U.S.C. §203(f). The work performed by Plaintiffs and the putative collective action members was neither in the employment of a farmer nor was it performed incidentally to or in conjunction with the farming operations of any farmer. During each workweek they worked for Defendants, Plaintiffs and the putative collective action members were employed in non-agricultural work within the meaning of the Internal Revenue Code (IRC) 26 U.S.C. § 3121(g). Defendants were not the owners, tenants or operators of all or most of the farms on which Plaintiffs and the putative collective action members worked.

32. Although it identified itself as a fixed site employer in its H-2A applications, during, 2021, 2022 and 2023, Boehnke Waste Handling, LLC primarily operated as an H-2A labor contractor which, in exchange for a fee, furnished Plaintiffs and the putative collective action members to various dairies, ranches, and farms in Lac qui Parle County and surrounding areas. During those years, little or none of Plaintiffs' and the putative collective action members' work was performed on Defendants' own farm. Instead, Plaintiffs and the putative collective action members worked providing services to other ranches, dairies, and farms in the area. These services performed by Plaintiffs and the putative collective action members on properties other than those owned or directly operated by Defendants were not "agricultural labor or services" under the H-2A regulations, 20 C.F.R. § 655.103(c).

33. When performing the manure handling tasks, Plaintiffs and the putative collective action members did not interact with or care for livestock. Plaintiffs and the putative collective action members were rarely assisted by employees of Defendants' farmer-clients.

34.     At all times relevant to this complaint, Plaintiffs' and the putative collective action members' work was performed as part of Defendants' waste handling operation, which was an independent business contracting with farms, ranches, and dairies to provide manure handling and hauling trucking services.

35.     During their employment with Defendants, Plaintiffs and the putative collective action members routinely worked in excess of 40 hours per workweek. Defendants were aware Plaintiffs and the putative collective action members regularly worked hours in excess of 40 hours per workweek.

36.     At all times relevant to this Complaint, Defendants employed Plaintiffs and the putative collective action members to perform these non-agricultural manure handling activities during each workweek at worksites not owned or operated by Defendants.

37.     Defendants knowingly, willfully, or in reckless disregard of the law, maintained an illegal practice of failing to pay Plaintiffs and the putative collective action members overtime wages for all hours worked in excess of 40 hours per workweek and the minimum wage for all hours worked.

## Defendants' Participation in the Federal H-2A Visa Program

38.     Defendants hired Plaintiffs and the putative collective action members through the H-2A program.

39.     The H-2A program was created by the Immigration and Nationality Act, 8 U.S.C. § 1188, and is implemented in part through regulations set out at 20 C.F.R. §§ 655.100 to 655.185 and 29 C.F.R. §§ 501.0 to 501.47. The H-2A program authorizes the admission of non-immigrant workers to perform agricultural labor or services of a seasonal or temporary nature.

40.     An employer in the United States may bring in individuals from foreign countries to perform agricultural labor or services of a temporary nature if the United States Department of Labor ("USDOL") certifies that (1) there are insufficient available workers within the United States to perform the job, and (2) the employment of aliens will not adversely affect the wages and working conditions of similarly-situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188(a)(1), and 20 C.F.R. § 655.100. Individuals admitted in this fashion are commonly referred to as "H-2A workers."

41.     An employer seeking admission of H-2A workers must first file a temporary employment certification application with the USDOL, pursuant to 20 C.F.R. § 655.130. This temporary employment certification application must include a job offer, commonly referred to as a "job order" or "clearance order," that complies with applicable regulations. 20 C.F.R. § 655.121. This job offer is used in the recruitment of H-2A workers. The job offer lists the number of H-2A workers an agricultural employer is requesting and specifies the starting and ending dates of the offered employment. The H-2A regulations establish the minimum benefits, wages, and working conditions that must be offered by agricultural employers to prospective H-2A workers in order to ensure that their employment does not adversely affect domestic U.S. workers. 20 C.F.R. § 655.122 and 20 C.F.R. § 655.135. Petitioning employers must certify that the job offer submitted as part of their H-2A application describes the actual terms and conditions of the employment being offered and that it contains all material terms of the job. 20 C.F.R. § 653.501(e)(3)(viii).

42.     As part of its application for H-2A workers, a petitioning employer must agree to comply with the USDOL's H-2A regulations. 20 C.F.R. § 655.135. Among other things, the employer must agree:

a. To provide at no cost to the H-2A workers housing that meets the full set of the Occupational Safety and Health Administration (OSHA) standards at 29 C.F.R. § 1910.142, 20 C.F.R. § 655.122(d);

b. To comply with all applicable Federal and State laws and regulations, including health and safety laws, 20 C.F.R. § 655.135(e);

c. To reimburse the worker for the reasonable cost of his inbound and outbound transportation costs and subsistence during travel, 20 C.F.R. § 655.122(h);

d. To not retaliate against, intimidate, threaten, restrain, coerce, blacklist, discharge, or in any way discriminate against workers who have instituted any complaint or proceeding related to the H-2A program regulations or who have consulted with an attorney or with a legal services program about the requirements of the H-2A regulations, 20 C.F.R. § 655.135(h); and

e. To pay workers at least the Adverse Effect Wage Rate (AEWR), the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, 20 C.F.R. §§ 655.120(a) and 655.122(l). The Federal minimum wage for non-agricultural work performed by temporary foreign workers is the annual mean wage for the geographic area and occupation as determined by the Bureau of Labor Statistics' Occupational and Employment and Wage Statistics program (OEWS), 20 C.F.R. § 655.10.

43.    The temporary labor certification filed by the employer, including the
accompanying job order constitutes the employment contract between the employer and any H-
2A worker hired to fill its labor requirements. 20 C.F.R. § 655.122(q).

44.    Defendants engaged the services of USA Farm Labor, Inc., a North Carolina
Corporation, to help apply for H-2A certification and later to recruit foreign workers to fulfill
Defendants' labor needs. USA Farm Labor, Inc. is an agency that assists employers file H-2A
applications and assists in the recruitment of temporary foreign workers for employment in the
United States.

**Defendants' H-2A Applications 2021 through 2023**

45.    With the assistance of USA Farm Labor, Inc., Defendants applied for and
received five H-2A temporary labor certifications during the relevant period between 2021 and
2023. In accordance with 20 C.F.R. § 655.130, each of these H-2A applications included a job
offer, commonly referred to as a "job order," complying with applicable regulations. These H-2A
applications identified Defendant Boehnke Waste Handling, LLC as the potential employer of
the H-2A workers.

46.    In March 2021, alleging a lack of available, documented agricultural workers in
the area of its operations, Defendants filed with the USDOL an H-2A application seeking
temporary labor certification to employ five temporary foreign workers as agricultural equipment
operators for a period from May 6, 2021 through December 31, 2021 (hereinafter "May 2021 H-
2A application"). The H-2A applications identified Defendant Boehnke Waste Handling, LLC as
the potential employer of the H-2A workers.

47.    In paragraph 8a of its job order filed as part of their May 2021 H-2A application,
Defendants listed the following regarding job duties: "Performs duties like: drive and operate

farm machinery to plant, cultivate, harvest corn and hay. Attach farm implements, such as plow, disc and drill to tractor. Till soil; plant and cultivate grain. Tow harvesting equipment. Drive and operate self-propelled combine. General lubrication, service (check fluids) and mechanical repair to farm machinery. Drive grain trucks to transport crops to elevator or storage area."

48.    In August 2021, alleging a lack of available, documented agricultural workers in the area of its operations, Defendants filed with the USDOL an H-2A application seeking temporary labor certification to employ 20 temporary foreign workers as agricultural equipment operators for a period from October 3, 2021 through December 31, 2021 (hereinafter "October 2021 H-2A application"). The H-2A applications identified Defendant Boehnke Waste Handling, LLC as the potential employer of the H-2A workers.

49.    In paragraph 8a of its job order filed as part of their October 2021 H-2A application, Defendants listed the following regarding job duties: "Perform duties on a farm for a farmer like: Drive/operate equipment such as GPS autosteer systems and skidsteer loader for liquid and dry manure management; attach implements; perform removal, pumping, application, and treatment of manure. Clear and maintain irrigation ditches. Clean and maintain yards, grounds, and facilities. Record information about liquid manure management. Repair, lubricate, and maintain equipment and pumps. May need to change oil, equipment disassembly and reassembly, welding, fabricating and sanding/grinding."

50.    The job order filed as part of their October 2021 H-2A application, Defendants stated that the work activities would be performed on multiple different worksites not owned or operated by Defendants.

51.    In February 2022, alleging a lack of available, documented agricultural workers in the area of its operations, Defendants filed with the USDOL an H-2A application seeking

temporary labor certification to employ 17 temporary foreign workers as agricultural equipment operators from April 11, 2022 through December 31, 2022 (hereinafter "April 2022 H-2A application"). The H-2A applications identified Defendant Boehnke Waste Handling, LLC as the potential employer of the H-2A workers.

52.    In paragraph 8a of the job order filed as part of their April 2022 H-2A application, Defendants stated the following regarding job duties: "Perform duties on a farm for a farmer like: Drive/operate equipment such as GPS autosteer systems and skidsteer loader for liquid and dry manure management; attach implements; perform removal, pumping, application, and treatment of manure. Clear and maintain irrigation ditches. Clean and maintain yards, grounds, and facilities. Record information about liquid manure management. Repair, lubricate, and maintain equipment and pumps. May need to change oil, equipment disassembly and reassembly, welding, fabricating and sanding/grinding. Mechanical work in the shop and semitruck driving."

53.    The job order filed as part of their April 2022 H-2A application, Defendants stated that the work activities would be performed on multiple different worksites not owned or operated by Defendants.

54.    In September 2022, alleging a lack of available, documented agricultural workers in the area of their operations, Defendants filed with the USDOL an H-2A application seeking temporary labor certification to employ eight temporary foreign workers as livestock workers and ranch hands from December 1, 2022 through April 30, 2023 (hereinafter "December 2022 H-2A application"). The H-2A applications identified Defendant Boehnke Waste Handling, LLC as the potential employer of the H-2A workers.

55.     In paragraph 8a of the job order filed as part of their December 2022 H-2A application, Defendants stated the following regarding job duties: "Performs any of the following tasks to attend to livestock: Fall cattle work/pregnancy. Weaning. Feeding cattle. Working and vaccinating cattle. Maintaining feed equipment. Welding maintenance. Inspect livestock for illness/injuries. Maintaining winter grazing fences. Hauling water to heifers. Prepping ranch barns and grounds for freeze. Opening frozen water tanks and springs. Snow removal. Shipping calves to market. Prep barns and cattle for calving. Calving begins end of February through April. Cleaning barns."

56.     As part of each of their temporary labor certification applications described in Paragraphs 45 to 55 and as required by 20 C.F.R. § 653.501(c)(3)(iii), Defendants provided assurances that "all working conditions comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration and other employment-related laws." In addition, each of these temporary labor certification applications contained an assurance pursuant to 20 C.F.R. § 655.135(e) that the employer would abide by all H-2A regulations, including those relating to worker housing (20 C.F.R. § 655.122(d)), reimbursement of inbound and outbound transportation costs (20 C.F.R. § 655.122(h)), compliance with Federal and State health and safety laws (20 C.F.R. § 655.135(e)), and prohibitions against retaliation (20 C.F.R. § 655.135(h)).

### Defendants Fail to Provide Habitable Housing to Plaintiffs

57.     The housing provided Plaintiffs by Defendants failed to comply with applicable federal health and safety standards.

58.     Plaintiffs Engelbrecht and De Klerk raised concerns with Defendants about the conditions of the housing provided to them. These complaints were based on a good-faith belief that Defendants' housing conditions violated applicable health and safety laws.

59.      Defendants identified the following housing sites as accommodations for the workers recruited and hired to fill the labor demands of their 2021 through 2023 H-2A applications:

      a.   An apartment located at 409 4th Street North in Marietta, Lac qui Parle County, Minnesota within Defendants' machine workshop (hereafter "workshop apartment");

      b.   A house located at 713 2nd Avenue in Madison, Lac qui Parle County, Minnesota (hereafter "713 2nd Avenue house");

      c.   A house located at 14771 485th Avenue in Big Stone, Grant County, South Dakota (hereinafter the "Big Stone House").

60.     All employer-provided housing for H-2A workers constructed since April, 1980 must meet OSHA safety and health standards set forth in 29 C.F.R. § 1910.142.

61.     As part of the temporary labor certification process, employers seeking certification to employ H-2A workers must have the state workforce agency inspect the employer's proposed worker housing and certify that the housing complies with the applicable safety and health regulations. 20 C.F.R. 655.122(d)(6)(ii).

62.     In June 2021, the Minnesota state workforce agency certified two rooms of the workshop apartment for occupancy by up to five workers total. No other rooms in the workshop apartment were certified for occupancy by workers. The remaining rooms were not approved for occupancy because the rooms lacked windows as required by 29 C.F.R. §1910.142(b)(7).

63.     This workshop apartment rooms were in close proximity to areas of the workshop where Defendants stored fuel, oil, and other chemicals and where workers repaired machinery.

64.     The 713 2nd Avenue house in Madison was not certified by the Minnesota state workforce agency for occupancy in either 2021 or 2022.

65.     Defendants nevertheless housed H-2A workers in the uncertified housing facilities up to and through the periods Plaintiffs were employed by Defendants.

66.     Defendants housed Plaintiff Engelbrecht in the 713 2nd Avenue house in 2022 and in the workshop apartment in 2021 in a room that had not been approved for occupancy.

67.     Defendants housed Plaintiff Beukes in the workshop apartment in 2021 and 2022 in rooms that had not been certified for occupancy.

68.     Defendants housed Plaintiff De Klerk in the workshop apartment in 2022 and 2023 in a room that had not been approved for occupancy.

69.     In 2022, Plaintiff Engelbrecht made a complaint to Defendants about accommodations provided by Defendants. Specifically, Plaintiff Engelbrecht complained about the H-2A workers staying in rooms in the workshop apartment that lacked windows and ventilation. He also complained to the employer that workers were being forced to stay near job sites in motel rooms not listed in the job orders.

70.     In 2022 and 2023, Plaintiff De Klerk alerted Defendants to the following substandard conditions at the workshop apartment:

        a.  Several rooms where workers lived had no windows or doors to the outside to provide ventilation;

        b.  All rooms located within Defendants' main workshop were in close proximity to chemicals, machinery and equipment that gave off diesel exhaust and other

fumes and odors and equipment covered in livestock manure;

c.  All rooms were located in close proximity to volatile and flammable liquids, including diesel fuel and oil for farm equipment.

71.     In addition to verbal reports, Plaintiff De Klerk made a written report to Defendants of housing violations he believed existed at the workshop apartment.

72.     Plaintiff De Klerk also made complaints to Defendants about housing violations he believed existed at the 713 2ⁿᵈ Avenue house in Madison, Minnesota because Defendants had told him it was not inspected and approved for occupancy by the Minnesota State workforce agency or other appropriate agency.

**Defendants Fail to Pay Plaintiffs and Putative Collective Action Members Properly for Nonagricultural Work**

73.     In August 2021, the US DOL Office of Foreign Labor Certification sent Defendants a Notice of Deficiency in response to Defendants' August 2021 H-2A application stating that work activities listed by Defendants did not fall under agriculture as set out in 20 C.F.R. §655.103(c). Specifically, the August 2021 OFLC deficiency letter concluded that:

a.  Defendants were operating as farm labor contractors;

b.  It was unclear from Defendants' application that the repair and maintenance of waste handling equipment at the workshop qualified as agricultural services under the H-2A regulations;

c.  Defendants did not establish in the application that the repair and maintenance activities would be performed by a farmer on a farm and therefore could not establish the job duties qualified as secondary agriculture within the meaning of the FLSA.

74.    Defendants' H-2A agent, USA Farm Labor, sent a letter on behalf of Defendants in response to the August 2021 OFLC deficiency letter. In the letter, USA Farm Labor stated that all activities would be performed by a farmer on a farm.

75.    However, during the times relevant to this action, Defendants' manure handling business operated independently from its clients' agricultural operations. Plaintiffs and the putative collective action members worked independently of any farm employees employed by Defendants' farmer clients.

76.    During the time relevant to this action, Defendants derived most of their income from contracting with other farmers to provide manure handling services rather than from their own farming activities.

77.    Manure management is a specialized and regulated business. Manure handling operations such as that operated by Defendants must obtain licenses in order to handle and spread manure as a service for hire.

78.    The manure handling work Plaintiffs and other similarly situated workers performed included:

      a.  driving and hauling equipment to a manure holding areas on worksites not owned or operated by defendants;

      b.  using pumping equipment to pump the manure or waste out of the holding area into tanks;

      c.  performing mechanical repairs on pumping equipment as needed to keep the equipment working;

      d.  using excavators and other large equipment to move manure around holding areas;

e.   hauling tanks of manure away from holding areas to other locations; and

f.   excavating and piling manure to dry into compost for use as fertilizer.

79.   The manure handing work Plaintiffs performed was hazardous and involved working with hazardous waste.

80.   Plaintiffs and other similarly situated workers were often required to work around large manure holding ponds or pits, sometimes referred to as "lagoons," as part of their job duties pumping manure.

81.   Manure holding pits and lagoons often trap toxic gases released by animal waste which can cause asphyxiation, illness, and death.

82.   Animal waste and manure can cause health problems and environmental degradation if not handled properly.

83.   The manure handling work Plaintiffs and other similarly situated workers performed was not agriculture within the meaning of the FLSA (29 U.S.C. 203(f)), the MFLSA (Minn. Stat. 177.23(8) and Minn. R. 5200.0260), or the H-2A regulations (20 C.F.R. 655.103(c)). Plaintiffs' manure handling work did not involve the care of or interacting with livestock. Plaintiffs' manure handling work sometimes included mechanical and repair work on machines while at worksites not owned or operated by Defendants. The manure handling involved hauling manure and equipment on and around worksites not owned or operated by Defendants. Defendants contracted with farms, dairies, feedlots, and ranches to provide manure pumping for hire and Plaintiffs were not involved in any primary agricultural activities such as harvesting, planting, growing, or harvesting of agricultural or horticultural commodities or care for or raising livestock.

84.   While employed by Defendants, Plaintiffs Engelbrecht, Beukes and De Klerk and

the putative collective action members regularly worked in excess of 40 hours per workweek.

85.     In 2022, Plaintiff Engelbrecht was paid at a rate of $15.37 per hour (the 2022 Minnesota AEWR) for every hour worked up to 48 hours per week and was paid $23.06 per hour for every hour worked over 48 hours per week.

86.     For his employment with Defendants in 2022, Plaintiff Beukes was paid a weekly salary of $800.00 for the first 48 hours worked and $15.37 per hour (the 2022 Minnesota AEWR) for every hour worked over 48 hours per week.

87.     In 2022, Plaintiff De Klerk was paid a salary of $800.00 for his first 48 hours of work per week and $15.37 per hour (the 2022 Minnesota AEWR) for every hour worked over 48 hours per week. In 2023, Plaintiff De Klerk was paid $800.00 for his first 48 hours of work per week plus $17.34 (the 2023 Minnesota AEWR) per hour for every hour worker over 48 hours per week.

88.     At no time relevant to this action did Defendants display in a conspicuous place at Plaintiffs' worksite a DOL poster notifying workers of their rights under the Fair Labor Standards Act, as required by 29 C.F.R. §516.4.

### Defendants Fail to Pay Plaintiffs and the Putative Collective Action Members for Compensable Travel Time

89.     While employed by Defendants, Plaintiffs and the putative collective action members were required to travel for hours to farm locations in Iowa, South Dakota, North Dakota, and other jobsites in Minnesota. Most of this travel occurred during Plaintiffs' normal work hours. Often, because of the great distance from Marietta, Plaintiffs and the putative collective action members were required to stay overnight near these remote jobsites.

90.     Before traveling to these remote locations, Plaintiffs and the other members of the putative collective action were required to pickup trucks and other equipment at Defendants'

workshop in Marietta, Minnesota in order to transport them to the jobsite. Defendants did not permit Plaintiffs and the other members of the putative collective action to clock in before driving these employer-owned vehicles from Defendants' workshop to remote jobsites.

91.    After completing work at a remote jobsite, Plaintiffs and the other putative collective action members traveled back to Defendants' workshop in Marietta to return the trucks and equipment for storage. Defendants required Plaintiffs and other members of the putative collective action to clock out before driving employer-owned vehicles back to Defendants' workshop after completing work at remote jobsites.

92.    When Plaintiffs and the other members of the putative collective action were required to stay overnight near these remote jobsites, they were required to travel between the work sites and their overnight lodging during normal work hours.

93.    Defendants failed to compensate Plaintiffs and the putative putative collective action members for the time they spent traveling between Marietta and remote jobsites and between remote jobsites and overnight lodging.

94.    Defendants partially compensated Plaintiff Beukes for his travel time and then required him to kick back those wages to Defendants. Defendants threatened to terminate Plaintiff Beukes' employment if he did not kick back these wages.

**Defendants Retaliate Against Plaintiff Engelbrecht**

95.    Plaintiff Cornelius Engelbrecht was issued an H-2As visa authorizing his employment with Defendants from April 2022 to December 2022 to help fill the labor requirements of the April 2022 H-2A application. Plaintiff Engelbrecht traveled from his home in South Africa to Minnesota, where he commenced work for Defendants in or around May 2022.

96.     During his employment with Defendants, Plaintiff Engelbrecht complained to Defendants regarding the wages he was paid and Defendants' failure to compensate him for all hours worked. Plaintiff Engelbrecht also complained that he and other H-2A workers were being assigned to worksites not listed in Defendants' H-2A applications. Some of the unlisted jobsites were outside of the states listed in the Defendants' H-2A applications and the accompanying job orders. Engelbrecht complained about these unlisted jobsites because he and other workers were required to stay at motels and pay to rent motel rooms with their own funds when traveling to these remote jobsites.

97.     In November 2022, Plaintiff Engelbrecht made plans to temporarily return home to South Africa to care for a family member for a few weeks before returning to work for Defendants in January 2023. Defendants approved Plaintiff's travel plans and agreed to allow Engelbrecht to return to work in 2023.

98.     In a letter to Plaintiff Engelbrecht, Defendants promised to provide Engelbrecht with work during 2023.

99.     Before returning to South Africa in late 2022, Plaintiff Engelbrecht met with Defendant Chad Boehnke to discuss the wages he was owed for his final paycheck along with the reimbursement he had been promised for his travel expenses.

100.    Instead of paying Plaintiff Engelbrecht the wages and travel expense reimbursements owed him, Defendants coerced Engelbrecht into signing a termination letter and demanded that Engelbrecht immediately vacate his quarters in Defendants' housing. Defendants told Plaintiff he was required to sign the termination letter or else he would not be paid his final wages.

101.    Plaintiff Engelbrecht was not terminated for cause.

102.    The termination letter Defendants forced Plaintiff Engelbrecht to sign included a statement, drafted by Chad Boehnke, declaring that "I authorize Boehnke to withhold my half of plane ticket from my pay." The termination letter did not state the specific amount to be withheld from Plaintiff Engelbrecht's paycheck for his airfare.

103.    Defendants withheld $627.40 from Plaintiff Engelbrecht's final paycheck, dated November 16, 2022. This deduction equaled the full amount of Plaintiff Engelbrecht's earned wages for the corresponding pay period. The deduction on Plaintiff Engelbrecht's November 16, 2022 paycheck was labeled as "Advance" under the notation "Adjustments to Net Pay."

104.    Plaintiff Engelbrecht worked at least 40.82 hours during the workweek from November 6 through November 12, 2022, the final pay period for which Engelbrecht received no cash wages. Defendants have never paid Plaintiff Engelbrecht his wages for his final workweek in November 2022.

105.    After forcing Plaintiff Engelbrecht to sign the termination letter, Defendants ordered Plaintiff Engelbrecht to immediately pack his belongings, and vacate his housing.

106.    Defendants transported Engelbrecht to the airport, and abandoned him there overnight to await his flight home to South Africa. Defendants charged Plaintiff Engelbrecht approximately $100.00 for transporting him to the airport. This left Plaintiff Engelbrecht with no money to pay for subsistence while traveling back to South Africa.

107.    Plaintiffs Engelbrecht also reported housing, wage, and H-2A contract violations to Defendants by email through USA Farm Labor. In retaliation for this and Engelbrecht's other reports, Defendants reneged on their written promise and did not hire Engelbrecht for employment in 2023.

108.    In or about January 2023, Defendant Chad Boehnke contacted at least two other

H-2A employers to urge them not to hire Plaintiff Engelbrecht.

109.    Plaintiff Engelbrecht attempted to find other work in the United States in 2023 but was unsuccessful because other H-2A employers had been advised by Chad Boehnke not to not hire Engelbrecht.

110.    Plaintiff Engelbrecht has suffered emotional distress in the form of worry, inability to pay for basic necessities, and inability to provide financially for his family due to Defendants' retaliatory conduct and interference with his attempts to find new work. This retaliation has detrimentally impacted Plaintiff Engelbrecht's personal finances causing him distress.

111.    As a result of Defendants' retaliatory conduct, breach of the H-2A employment contract, and violations of the FLSA, Plaintiff Engelbrecht has been denied wages to which he was entitled and continues to suffer emotional distress, and other damages.

**<u>Defendants Retaliate Against Plaintiff De Klerk</u>**

112.    Plaintiff Stephanus De Klerk was issued an H-2A visa authorizing his employment with Defendants from December 1, 2022 through April 30, 2023 to help fill the labor requirements of the December 2022 H-2A application. Plaintiff De Klerk commenced work for Defendants in December, 2022.

113.    While working for Defendants, Plaintiff De Klerk labored in unsafe working conditions. Among other things, Plaintiff De Klerk worked around hazardous chemicals and manure stored in Defendants' workshop.

114.    Throughout his employment with Defendants, Plaintiff De Klerk raised concerns with Defendants about substandard housing conditions, workplace safety violations, wage and hour violations, and violations of H-2A regulations.

115.    Plaintiff De Klerk complained to Defendants regarding the substandard housing conditions at Defendants' workshop apartment including the lack of windows for ventilation, overcrowding, and exposure to the fumes and odors of fuel, chemicals, and manure stored in the workshop.

116.    Plaintiff De Klerk raised concerns with Defendants about Defendants' failure to provide De Klerk proper protective gear and training for safely handling the manure. Plaintiff De Klerk requested protective equipment such as masks which would be capable of filtering manure fumes, hazardous material protective suits, and rubber boots as protection from manure.

117.    Beginning on January 1, 2023, the Minnesota Adverse Effect Wage Rate (AEWR) increased to $17.34 per hour. Pursuant to their H-2A application, Defendants were required to pay the increased AEWR as of its effective date on January 1, 2023.

118.    Despite the increase in the AEWR, Defendants paid Plaintiff De Klerk and the other H-2A workers $16.47 (the 2022 South Dakota AEWR) per hour for their work during January 2023. This violated the promise set forth in the December 2022 H-2A application to pay the AEWR for agricultural work and the Federal minimum wage for non-agricultural work.

119.    Plaintiff De Klerk raised concerns with Defendants that he and other workers were not being paid the 2023 Minnesota AEWR for their work in Minnesota as of January 1, 2023.

120.    A poster hung in Defendants' workshop stating that workers would be beaten if they did not work. Plaintiff De Klerk raised concerns with Defendants regarding the message conveyed by this poster because it threatened violence if he and others did not work.

121.    On or around February 8, 2023, Plaintiff De Klerk delivered a written note to Defendants regarding the violations of law he believed in good faith existed. The report was

made on behalf of himself and his co-workers and was prompted by De Klerk's concern for his health and safety. Among other things, the note memorialized De Klerk's concerns regarding Defendants' violations of workplace safety, housing, and wage laws. Namely, Plaintiff De Klerk complained to Defendants about:

      a.  Manure fumes and chemicals near the workshop living quarters and rooms with no ventilation;

      b.  Rodent infestation in rooms and common areas of the workshop apartment;

      c.  Lack of heat in the workshop apartment;

      d.  Defendants' failure to reimburse him for travel time;

      e.  Defendants failure to reimburse Plaintiff De Klerk and other workers for meals while on the road and fuel he purchased for Defendants' vehicles.

122.    In response to Plaintiff De Klerk's note reporting his concerns about these issues and violations of law, Defendants terminated De Klerk's employment in early February 2023.

123.    Defendant Boehnke told Plaintiff De Klerk that if he did not like his employment at Boehnke Waste Handling, LLC, he should leave. Because Defendant Boehnke was yelling irately at him, De Klerk felt his personal safety was threatened and called local law enforcement to assist him in departing Defendants' premises and moving to a safe location.

124.    Plaintiff De Klerk stayed in a motel as a safe alternative to his employer-provided housing for two days before returning to the worksite.

125.    After two days, De Klerk returned to Defendants' workshop apartment in order to ensure that his belongings were secure.

126.    On or around February 10, 2023, after Plaintiff De Klerk returned to the worksite, Defendants coerced De Klerk into signing a termination letter by telling him that he would not be

paid his wages unless he signed the letter. In order to obtain the wages due him, De Klerk signed the termination letter. Afterwards, Chad Boehnke required De Klerk to leave the worksite and vacate his employer-provided housing.

127.   Following his termination, Plaintiff De Klerk was forced to stay in motels at his own expense until he was able to obtain work with a different H-2A employer.

128.   In March 2023, Plaintiff De Klerk was able to secure employment in Arkansas with a new H-2A employer. In his new job, De Klerk was paid at a wage rate of $13.67 per hour (the 2023 Arkansas AEWR) with no premium wages paid for overtime hours. These wages were substantially lower than what he earned while in Defendants' employ. In addition, De Klerk was offered fewer hours of work by his Arkansas employer than would have been available had he remained employed with Defendants.

129.   Plaintiff De Klerk experienced stress and fear as a result of Defendants' retaliatory conduct. De Klerk continues to experience mental and emotional distress as a result of Defendants' retaliatory conduct and violation of his workplace rights.

130.   Plaintiff De Klerk suffered lost income as a result of Defendants' retaliatory conduct, breaches of the H-2A employment contract, and violations of the FLSA.

**FIRST CAUSE OF ACTION**
**Violation of the Fair Labor Standards Act – Minimum Wage -Named Plaintiffs and the Collective Action Members**
**(FLSA 29 U.S.C. §206)**

131.   Plaintiffs hereby incorporate by reference all previously stated allegations as though set forth fully herein.

132.    Plaintiffs assert this claim for damages on behalf of themselves and the members of the collective action, pursuant to the FLSA, 29 U.S.C. §§ 201, *et seq*.

133.    Defendants violated 29 U.S.C. § 206 by failing to pay Plaintiffs and the putative

collective action members the FLSA minimum wage for every hour they worked. Specifically, Defendants failed to pay Plaintiffs and the collective action members for compensable travel time, including time traveling to remote worksites during their normal workday hours as set forth in Paragraphs 89 to 94.

134.     Defendants willfully, knowingly, or with reckless disregard of the law failed to pay Plaintiffs and the putative collective action members the minimum wage for every hour they worked in violation of 29 U.S.C. §206.

135.     Because of Defendants' violation of Section 6 of the FLSA, Plaintiffs and the collective action members are entitled to recover their unpaid minimum wages, plus an equal amount in liquidated damages, reasonable attorney's fees, and costs.

**SECOND CAUSE OF ACTION**
**Violation of the Fair Labor Standards Act – Minimum Wage – Plaintiff Engelbrecht**
**(FLSA 29 U.S.C. §206)**

136.     Plaintiff Engelbrecht hereby incorporates by reference all previously stated allegations as though set forth fully herein.

137.     Defendants violated 29 U.S.C. § 206 by failing to pay Plaintiff Engelbrecht the FLSA minimum wage for every hour he worked. Specifically, Defendants failed to pay Plaintiff Engelbrecht any wages whatsoever for his final week of work in November 2022 as set forth in Paragraph 104.

138.     To this date, Defendants have not paid Plaintiff Engelbrecht his wages his final week of work in November 2022 as set forth in Paragraph 104.

139.     Because of Defendants' violation of the minimum wage provisions of the FLSA, Plaintiff Engelbrecht is entitled to recover his unpaid minimum wages, plus an equal amount in liquidated damages, a reasonable attorney's fee, and costs.

**THIRD CAUSE OF ACTION**
**Violation of the Fair Labor Standards Act – Overtime –Plaintiffs and the Collective Action**
**Members**
**(FLSA 29 U.S.C. §207)**

140.    Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

141.    Plaintiffs assert this claim for damages against Defendants on behalf of themselves and the collective action members, pursuant to the FLSA, 29 U.S.C. §§ 201, *et seq*.

142.    In each workweek, Plaintiffs and the other members of the collective action performed at least some work on the farms, ranches, dairies, or operations of fixed site employers other than Defendants as set forth in Paragraphs 75 to 83. Because this work was not agricultural within the meaning of the FLSA, Defendants were subject to the FLSA's maximum hours/overtime provisions throughout this period. 20 C.F.R. §780.11.

143.    Defendants violated 29 U.S.C. § 207 by failing to pay Plaintiffs and members of the collective action overtime wages at one-and one-half times their regular rate of pay for every hour they worked in excess of 40 hours in each workweek as set forth in Paragraphs 84 to 87.

144.    Defendants willfully, knowingly, or with reckless disregard of the law failed to pay Plaintiffs and the putative collective action members overtime wages for every hour they worked in excess of 40 hours per workweek in violation of 29 U.S.C. §207.

145.    Because of Defendants' violation of the overtime provisions of the FLSA, Plaintiffs and members of the collective action are entitled to recover their unpaid overtime wages, plus an equal amount in liquidated damages, a reasonable attorney's fee, and costs.

**FOURTH CAUSE OF ACTION**
**Violation of Minnesota Whistleblower Act – Plaintiffs Engelbrecht and De Klerk**
**(Violation of Minnesota Whistleblower Act, Minn. Stat. § 181.932, subd. 1; 20 C.F.R.**
**655.135 (e))**

146.    Plaintiffs incorporate by reference all previous allegations as though set fort fully herein.

147.    Minn. Stat. § 181.932 provides that an employer may not threaten, penalize, or otherwise discriminate against an employee regarding the employee's terms, conditions, or privileges of employment because the employee, in good faith, reports a violation of any federal or state law to an employer or to any governmental body or law enforcement official or because the employee has been requested to and does participate in an investigation by any public body or office.

148.    An employer who participates in the H-2A program agrees to obey all state laws applicable to their employment of their foreign workers and agrees not to engage in unfair or retaliatory treatment of employees for filing a complaint related to any regulation. 20 C.F.R. § 655.135.

149.    Plaintiff Engelbrecht engaged in protected activity by making verbal and written reports to the Defendants on behalf of himself and others about violations of wage laws, workplace safety protections, housing standards, and violations of H-2A regulations on behalf of himself and others as set forth in Paragraph 96 and 107.

150.    Defendants retaliated against Plaintiff Engelbrecht by terminating his employment, threatening him, reneging on their promise to rehire him in 2023, and interfering with his future employment prospects as set forth in Paragraphs 100 and 107 to 109.

151.    Engelbrecht's loss of employment and employer-provided housing was causally connected to his protected activity.

152.     Plaintiff De Klerk engaged in protected activity by making verbal and written reports to Defendants about violations of wage laws, workplace safety protections, and housing standards as set forth in Paragraphs 114 to 121.

153.     Defendants retaliated against Plaintiff De Klerk by terminating his employment, threatening him, and forcing him to vacate his employer-provided housing as set forth in Paragraphs 122, 123, and 126.

154.     Plaintiff De Klerk's loss of employment and housing was causally connected to his protected activity.

155.     As a result of Defendants' violations as set forth in this count, Plaintiffs Engelbrecht and De Klerk are entitled to recover damages, reasonable attorney's fees, and costs of this action pursuant to Minn. Stat. § 181.935.

## FIFTH CAUSE OF ACTION
### Breach of Employment Contract – Anti-Retaliation Provisions – Plaintiffs De Klerk and Engelbrecht
### (20 C.F.R. §655.135)

156.     Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

157.     As part of an Application for Temporary Employment Certification an H-2A employer must agree that it will abide by the H-2A regulations, including the anti-discrimination requirements of 20 C.F.R. § 655.135(h).

158.     Federal regulations also forbid H-2A employers from retaliating against employees who exercise or assert rights or protections afforded by the H-2A regulations. 20 C.F.R. §655.135(h)(5) and 29 C.F.R. §501.4(a)(5).

159.    Pursuant to 20 C.F.R. § 655.122(q), Defendants' H-2A applications and the accompanying job orders served as the employment contracts between Plaintiffs and Defendants Boehnke Waste Handling, LLC.

160.    Defendants offered, and Plaintiffs accepted, employment with certain conditions outlined in Defendants' 2021 and 2022 H-2A applications and the accompanying job orders as set out in Paragraphs 41 to 43 and 56.

161.    Among the contractual terms that Defendants offered, and Plaintiffs accepted, was a promise by Defendants not to retaliate or discriminate against, intimidate, threaten, restrain, coerce, blacklist, or discharge any person who has exercised or asserted on behalf of himself or others any right or protection under the H-2A contract, or who has consulted with an attorney or employee of a legal assistance program.

162.    Plaintiffs performed under the terms of their employment contracts by providing the requested labor to Defendants.

163.    Defendants breached their employment contracts with Plaintiffs by prematurely terminating their employment in response to their assertion of their rights and protections under the H-2A program as set forth in Paragraphs 100, 107 to 109, 122, 123, and 126.

164.    As a direct consequence of Defendants' breach of their employment contracts, Plaintiffs suffered economic injury.

### SIXTH CAUSE OF ACTION
### Breach of Employment Contract – Wage Provisions- All Plaintiffs

165.    Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

166.    As part of its temporary labor certification applications and the job orders under which it employed Plaintiffs and as required by 20 C.F.R. §§ 655.120(a) and 655.122(l),

Defendants agreed to pay Plaintiffs the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining, wage, or the Federal or State minimum wage. For Plaintiffs' agricultural work, the highest of these wages was the applicable AEWR. For Plaintiffs' non-agricultural work, the highest of these wages was the Federal minimum wage for non-agricultural temporary foreign workers as determined by the Bureau of Labor Statistics' OEWS program and as mandated by 20 C.F.R. § 655.10.

167.    Defendants failed to pay Plaintiffs the wage rates guaranteed by their employment contracts, as embodied in the job orders under which they were hired. For those workweeks in which they performed at least some non-agricultural work as described in Paragraph 83, Plaintiffs were ordinarily paid the agricultural AEWR rather than the Federally required OEWS wage as set forth in Paragraph 42(e). By failing to pay Plaintiffs the wages set out in their employment contracts, Defendants breached those contracts.

168.    As a direct result of Defendants' contractual breaches as described in this count, Plaintiffs were deprived of wages earned and due from Defendants, travel expense reimbursements, and other damages.

## SEVENTH CAUSE OF ACTION
## UNAUTHORIZED WAGE DEDUCTIONS – Plaintiffs Engelbrecht and Beukes
### (Minn. Stat. § 181.79)

169.    Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

170.    Minn. Stat. § 181.79 prohibits employers from directly or indirectly making a deduction from an employee's wages unless the employee, after the claimed indebtedness has arisen, voluntarily authorizes the employer in writing to make the deduction, or the employee is held liable in court for the indebtedness.

171.    Defendants did not obtain authorization from Plaintiff Engelbrecht to make deductions from his wages as set forth in Paragraph 102. No court has determined that Engelbrecht is liable for this indebtedness.

172.    Defendants made deductions in the amount of $627.40 from Plaintiff Engelbrecht's wages for his final workweek in 2022 as set forth in Paragraph 103.

173.    Defendants made deductions from Plaintiff Beukes' pay by requiring him to kick back to Defendants money he had earned for compensable travel time as set forth in Paragraph 94.

174.    As a direct and proximate result of Defendants' unlawful conduct as set forth in this count, Plaintiffs Engelbrecht and Beukes have suffered a loss of income and other damages.

175.    Pursuant to Minn. Stat. §§ 181.79, Defendants are liable to Plaintiffs Engelbrecht and Beukes for twice the amount of the deductions taken, as well as reasonable costs, disbursements, witness fees and attorney's fees.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE MINNESOTA FAIR LABOR STANDARDS ACT – All Plaintiffs**
**(MINIMUM WAGE)**
**(Minn. Stat. §177.24)**

176.    Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

177.    The Minnesota Fair Labor Standards Act (MFLSA), Minn. Stat. §177.24, requires employers to pay employees at least a statutorily prescribed minimum wage for every hour worked during a workweek.

178.    Plaintiffs' employment with Defendants during 2021, 2022, and 2023 was subject to the minimum wage requirements of the MFLSA.

179.    Plaintiffs worked hours for Defendants for which each of them was not paid the minimum wage as set forth in Paragraphs 89 to 94.

180.    Defendants have not paid Plaintiff Engelbrecht his wages for his labor during the workweek of November 6, 2022 through November 12, 2022 as set forth in Paragraph 102.

181.    Defendants willfully, knowingly, or with reckless disregard of the law failed to pay Plaintiffs the minimum wage for every hour worked in violation of Minn. Stat. §177.24.

182.    Pursuant to Minn. Stat. 177.27, subd. 8, Defendants are liable to Plaintiffs for the full amount of unpaid wages plus an equal amount in liquidated damages, as well as attorney's fees and the costs of bringing this action.

### NINTH CAUSE OF ACTION
### <u>VIOLATIONS OF THE MINNESOTA FAIR LABOR STANDARDS ACT</u>
### <u>(OVERTIME) –PLAINTIFFS BEUKES AND DE KLERK</u>
### (MFLSA, Minn. Stat. §177.25)

183.    Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

184.    Non-exempt employees in Minnesota must be paid at a rate of one-and-one-half times their hourly rate for every hour worked in excess of 48 hours in one workweek pursuant to Minnesota Statutes, section 177.25.

185.    Plaintiffs were employees of Defendants as defined in Minnesota Statutes, section 177.23.

186.    As set forth in Paragraphs 86 and 87, Plaintiffs Beukes and De Klerk were paid a minimum weekly salary for the first 48 hours they worked in each workweek and were paid the applicable AEWR for every hour worked in excess of 48 hours in each workweek.

187.    Defendants paid Plaintiffs Beukes and De Klerk in the manner set forth in Paragraphs 86 and 87 pursuant to Minnesota Statutes, section 177.23, which exempts workers from receiving overtime pay in Minnesota if the workers are employed in agriculture and are paid a minimum weekly salary.

188.    Plaintiffs were not employed in agriculture as defined in Minnesota Rules, section 5200.0260 while working for Defendants as set forth in Paragraph 83 and therefore were not exempt from receiving overtime pay at a rate of one-and-one-half times their hourly rate for hours worked in excess of 48 hours as set forth in Paragraph 83.

189.    Defendants failed to pay Plaintiffs Beukes and De Klerk at a rate of one-and-one-half times their hourly wage rate for every hour Plaintiffs Beukes and De Klerk worked in excess of 48 hours during a workweek.

190.    Defendants willfully, knowingly, or with reckless disregard of the law failed to pay Plaintiffs Beukes and De Klerk overtime wages in violation of Minn. Stat. §177.25.

191.    Pursuant to Minn. Stat. § 177.27, subd. 8, Defendants are liable to Plaintiffs Beukes and De Klerk for unpaid overtime wages plus an equal amount in liquidated damages, plus reasonable attorney's fees and costs.

## ELEVENTH CAUSE OF ACTION
## QUANTUM MERUIT – All Plaintiffs

192.    Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

193.    Defendants requested Plaintiffs to perform non-agricultural activities within the meaning of the H-2A regulations, 20 C.F.R. § 655.103(c), including pumping manure, working near and hauling hazardous animal waste, performing mechanical repairs on equipment, and driving trucks and hauling manure handling equipment at worksites not owned or operated by Defendants as set forth in Paragraphs 78 to 83.

194.    For this nonagricultural work, Defendants failed to pay Plaintiffs the prevailing wage rates to which they were entitled under the law as described in Paragraph 42(e).

195.    Plaintiffs performed valuable non-agricultural work, including the handling of hazardous waste, for Defendants throughout the period of their employment.

196.    Defendants requested Plaintiffs to perform this non-agricultural labor, accepted the benefit of Plaintiffs' labor and knew that Plaintiffs reasonably expected compensation for this non-agricultural labor.

197.    Because the wage paid Plaintiffs' was the agricultural AEWR rather than the Federal minimum wage promised in Plaintiffs' employment contracts, then that wage term was illegal and void as against public policy. In the absence of a lawful wage term, Plaintiffs are entitled to payment, *in quantum meruit*, for the fair and reasonable value of the non-agricultural labor they provided, which wage cannot be less than the legal minimum wage applicable to temporary foreign visa workers performing such labor. As a consequence, Plaintiffs are entitled to recover in *quantum meruit* the difference between the wages they were paid and the fair and reasonable value of the non-agricultural services they performed.

## **TWELVTH CAUSE OF ACTION**
## **UNJUST ENRICHMENT – All Plaintiffs**

198.    Plaintiffs hereby incorporate by reference all previous allegations as though set forth fully herein.

199.    During 2021, 2022 and 2023, Defendants assigned Plaintiffs to perform non-agricultural activities, including pumping manure, performing mechanical repairs, and driving trucks at worksites not owned or operated by Defendants as set forth in Paragraph 78.

200.    The non-agricultural activities performed by Plaintiffs were not agricultural labor or services within the meaning of 20 C.F.R. § 655.103(c) as set forth in Paragraph 83.

201.    Plaintiffs conferred a benefit on Defendants through their long hours of non-agricultural labor, whereby Defendants obtained Plaintiffs' services for a lower pay rate than the actual value of these services, which was substantially higher.

202.    Defendants knew and appreciated the benefit conferred by Plaintiffs' labor through their knowledge that the wages paid to Plaintiffs for this non-agricultural labor were lower than the lawful Federal minimum wage applicable to temporary foreign visa workers performing this same sort of labor in the area.

203.    Defendants accepted and retained the benefit of Plaintiffs' non-agricultural labor under circumstances that would make it inequitable for Defendants to retain that benefit.

204.    As a result, Defendants were enriched at the expense of Plaintiffs, and Plaintiffs are entitled to the value of the benefit conferred, which in this case cannot be less than the difference between the wages they were paid and the legal Federal minimum wage for temporary foreign visa workers performing the same work in the area.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an order granting Plaintiffs the following relief:

A.  Allowing this action to proceed as a collective action pursuant to 29 U.S.C. §216(b) on behalf of the members of the FLSA collective action class defined in Paragraph 21;

B.  Awarding judgment and damages against Defendants in an amount to be determined at trial;

C.  Awarding Plaintiffs and the collective action members their unpaid minimum wages due under 29 U.S.C. § 206 for uncompensated travel time, plus an additional and equal amount as liquidated damages;

D.  Awarding Plaintiff Engelbrecht his unpaid minimum wages pursuant to 29 U.S.C. §206 for his last pay period of work, plus an additional sum in liquidated damages and reasonable attorneys' fees;

E.  Awarding Plaintiffs and the collective action members their unpaid overtime wages pursuant to 29 U.S.C. § 207, plus an additional and equal sum in liquidated damages and reasonable attorney's fees;

F.  Awarding Plaintiffs Engelbrecht and De Klerk actual and statutory damages under Minn. Stat. §181.932;

G.  Awarding Plaintiffs Engelbrecht and Beukes actual and statutory damages under Minn. Stat. §181.79;

H.  Awarding Plaintiff Engelbrecht actual and liquidated damages under Minn. Stat. §177.27;

I.  Awarding Plaintiffs damages for Defendants' breaches of contract;

J.  Awarding Plaintiffs damages for breach of contract, *quantum meruit*, or, alternatively, unjust enrichment in an amount equal to the difference between the wages paid them and the reasonable and fair value of their services (which cannot be less than the Federal minimum wage applicable to temporary foreign visa workers performing the same tasks as Plaintiffs in the area of employment);

K.  Awarding Plaintiffs reasonable attorney's fees, necessary expenses, and costs;

L.  Awarding Plaintiffs pre-judgment and post-judgment interest as allowed by law; and

M.  Granting Plaintiffs all such other relief as this Court deems just and proper.


Dated: <u>March 8, 2024</u>              SOUTHERN MINNESOTA REGIONAL
                                        LEGAL SERVICES, INC.

By: /s/ Peter Murray
Peter Murray, MN ID #0402764
55 East 5th St., Suite 400
St. Paul, MN 55101
Telephone: (651) 894-6951
Fax: (651) 297-9757
Peter.Murray@SMRLS.org


/s/ Elana Gold
Elana Gold, MN ID #0504804
55 East 5th St., Suite 400
St. Paul, MN 55101
Telephone: (651) 894-6815
Fax: (651) 297-9757
Elana.Gold@SMRLS.org


/s/ Griselt Andrade
Griselt Andrade, MN ID #0389774
55 East 5th St., Suite 400
St. Paul, MN 55101
Telephone: (701) 232-8872
Fax: (651) 297-9757
Griselt.Andrade@SMRLS.org


/s/ Lisa Hollingsworth
Lisa Hollingsworth, MN ID #0287163
55 East 5th St., Suite 400
St. Paul, MN 55101
Telephone: (651) 228-9823
Fax: (651) 297-9757
Lisa.Hollingsworth@SMRLS.org

**Attorneys for Plaintiffs and Putative
Collective Action Members**